# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-1198V

Filed: March 7, 2023

* * * * * * * * * * * * * * * * * *
| | |
|---|---|
| SCOTT SWAILES, | * |
| | * |
| Petitioner, | *   UNPUBLISHED |
| | * |
| v. | * |
| | * |
| SECRETARY OF HEALTH | *   Ruling on Onset; Influenza |
| AND HUMAN SERVICES, | *   ("Flu") Vaccine; Should Injury |
| | *   Related to Vaccine Administration |
| Respondent. | *   ("SIRVA"). |
| | * |
| | * |

* * * * * * * * * * * * * * * * * *

*Elizabeth Abramson, Esq.*, Maglio Christopher & Toale, Washington, D.C., for petitioner.
*Colleen Hartley, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON ONSET[1]

**Roth**, Special Master:

On September 6, 2017, Scott Swailes ("petitioner" or "Mr. Swailes") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleges that within 48 hours of a seasonal influenza vaccination received in his upper left arm on October 20, 2015, he developed the onset of persistent pain surrounding the injection site.[3] Petition at 2, ECF No. 1; Amended Petition at 2, ECF No. 12.

---

[1] Although this Ruling has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Ruling will be available to anyone with access to the internet.** However, the parties may object to the Ruling's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public. *Id*.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Neither the petition nor the amended petition specifies the injury alleged. *See* Petition; Amended Petition.

1

For the reasons detailed below, I find that petitioner developed left shoulder pain the day following his October 20, 2015 vaccine.

## I. Procedural History

The petition was filed on September 6, 2017 and was assigned to the Special Processing Unit ("SPU"). ECF No. 1, 4. On September 14, 2017, petitioner filed the vaccination record and petitioner's affidavit. Pet. Ex. 1-2, ECF No. 6. On October 31, 2017, petitioner filed medical records, a statement of completion, and an amended petition with a more detailed recitation of the facts. Pet. Ex. 3, ECF Nos. 10-12.

An initial status conference was held on November 28, 2017. After two requests for enlargement of time, respondent filed his Rule 4(c) Report on July 13, 2018, stating that this case was not appropriate for compensation. ECF No. 14, 16, 22. The case was reassigned to the undersigned on August 17, 2018. ECF No. 24.

A status conference was held on December 4, 2018, after which petitioner was ordered to file medical records confirming in which arm the vaccine was received and a supplemental affidavit. ECF No. 26. On December 21, 2018, petitioner filed the requested medical records and petitioner's supplemental affidavit, as well as a statement of completion. Pet. Ex. 4-6, ECF No. 27-28. Respondent filed a status report, stating that he intended on defending this case. ECF No. 29.

Another status conference was held on June 5, 2019, after which the parties were ordered to file a joint status report providing mutually agreeable dates for a fact hearing. ECF No. 30. The fact hearing was subsequently scheduled for and took place on April 21, 2021. ECF No. 32.

Following the hearing and on April 27, 2021, petitioner filed his calendar and Google search history. Pet. Ex. 7-8, ECF No. 37. On May 15, 2021, petitioner filed a status report, requesting a general Findings of Fact rather than just a Ruling on Onset. ECF No. 42. Respondent did not respond to this request.

On December 14, 2021, Ms. Abramson, petitioner's current counsel, substituted as petitioner's Counsel of Record. ECF No. 46.

No other records were filed.

## II. The Factual Record

### A. Petitioner's Medical Records

#### a. Pre-Vaccine Medical History

2

Petitioner's past medical history is generally unrelated to the injury claimed herein. *See generally* Pet. Ex. 3. He was seen for plantar fibromatosis,[4] hyperlipidemia,[5] low vitamin D, and hypertension,[6] among other conditions. *Id*. at 2, 4, 12.

In April of 2015, in addition to the foregoing conditions, petitioner's medical record includes dyslipidemia,[7] macrocytosis,[8] and enthesopathy[9] of the elbow region (arm not designated). Pet. Ex. 3 at 172.

On October 16, 2015, petitioner presented to the Veteran's Administration ("VA") for follow up of multiple problems, including plantar fasciitis,[10] left knee pain, and sleep issues. Pet. Ex. 3 at 163-64.

Petitioner presented to Walgreen's Pharmacy on October 20, 2015 and received an influenza vaccine in his left arm. Pet. Ex. 1 at 2.

### b. Post-Vaccine Medical History

On November 19, 2015, petitioner called the VA and reported "persistent left shoulder pain since receiving flu shot at Walgreens." He also reported some numbness in his left arm and difficulty sleeping at night due to the pain. Pet. Ex. 3 at 106.

---

[4] Plantar fibromatosis is fibromatosis involving the plantar fascia, manifested as single or multiple nodular swellings, sometimes accompanied by pain but usually unassociated with contractures. *Plantar fibromatosis, Dorland's Medical Dictionary Online,*
https://www.dorlandsonline.com/dorland/definition?id=75767&searchterm=plantar+fibromatosis (last visited Mar. 2, 2023).

[5] Hyperlipidemia is a general term for elevated concentrations of any or all of the lipids in the plasma. Hyperlipidemia, *Dorland's Medical Dictionary Online,*
https://www.dorlandsonline.com/dorland/definition?id=23870&searchterm=hyperlipidemia (last visited Mar. 2, 2023).

[6] Hypertension refers to high arterial blood pressure. Hypertension, *Dorland's Medical Dictionary Online,* https://www.dorlandsonline.com/dorland/definition?id=24027&searchterm=hypertension (last visited Mar. 2, 2023).

[7] Dyslipidemia is abnormality in, or abnormal amounts of, lipids and lipoproteins in the blood. *Dyslipidemia, Dorland's Medical Dictionary Online,*
https://www.dorlandsonline.com/dorland/definition?id=15224&searchterm=dyslipidemia (last visited Mar. 2, 2023).

[8] Macrocytosis is the presence of macrocytes in the blood. *Macrocytosis, Dorland's Medical Dictionary Online*, https://www.dorlandsonline.com/dorland/definition?id=29236 (last visited Mar. 2, 2023).

[9] Enthesopathy is a disorder of the muscular or tendinous attachment to bone. Enthesopathy*, Dorland's Medical Dictionary Online*,
https://www.dorlandsonline.com/dorland/definition?id=16642&searchterm=enthesopathy (last visited Mar. 2, 2023).

[10] Plantar fasciitis is inflammation of plantar fascia, owing to repetitive stretching or tearing of muscle fibers near their attachment to the calcaneal tuberosity; it is one of the most common causes of heel pain. *Plantar fasciitis*, *Dorland's Medical Dictionary Online*,
https://www.dorlandsonline.com/dorland/definition?id=75012&searchterm=plantar+fasciitis (last visited Mar. 2, 2023).

Petitioner's primary care physician ("PCP") returned his phone call the following day, on November 20, 2015. Pet. Ex. 3 at 100. Petitioner advised that he received a flu shot three weeks prior that was administered "really high near [his] shoulder". The person giving the shot told him to keep moving his arm. He advised the administrator of the vaccine that he was going home to do yard work and she said that was fine. *Id*. He did the yard work and was "fine until 3 days after the shot" when his shoulder started hurting "really bad" especially when moving a certain way or laying back on it. He also reported that he had tingling in his fingers. Petitioner advised that he looked his symptoms up on the internet and found that shots given too high near the shoulder can get into the bursa and cause the symptoms he was experiencing. Petitioner stated that he had not yet contacted the Walgreens where he received the vaccine. *Id*.

Petitioner went to Walgreens that day and reported his left shoulder pain. Pet. Ex. 3 at 100. His information and the lot number were documented, and he was advised the matter would be looked into further. He was also instructed to take B6 for the nerve pain. *Id*. Petitioner reported to a nurse at his PCP's office by telephone that his pain was a 9/10 when he laid down or moved his shoulder in certain positions. He stated he had a similar problem 5-6 years ago when he used to pull on a grab bar to get in and out of the car, but the pain resolved when he stopped using the grab bar. *Id*. Petitioner further advised "the same thing happened" 10 years ago and resolved after 3.5 weeks. The nurse instructed petitioner to present to the Durham VA emergency room ("ER"). *Id*.

Petitioner presented to the VA ER the following day, November 21, 2015, reporting one month of left shoulder pain after receiving a flu shot that had gradually worsened with associated neck and left scapular pain with range of motion. Pet. Ex. 3 at 90-91, 111, 120. Petitioner also complained of tingling and numbness of the left thumb for one month. He stated that he had problems with his left shoulder while in the military. *Id*. at 111. The discharge diagnosis on that day was cervical radiculopathy/neuropathy.[11] *Id*. at 116. Petitioner was prescribed Baclofen for spasms. *Id*. at 12.

Petitioner underwent magnetic resonance imaging ("MRI") of his neck on November 21, 2015, which showed degenerative disc disease in the cervical spine, worse at C5-C7. Pet. Ex. 3 at 29-30. An X-ray of the left shoulder performed that day was normal. *Id*. at 30-31.

Petitioner returned to the VA on December 14, 2015. Pet. Ex. 3 at 93. The record documents receipt of a flu vaccine on November 20, 2015,[12] administered higher than normal with onset of left shoulder pain two days later that sometimes interfered with his sleep. *Id*. The record further notes, "[A]bout 3 wks later, pain is much better and no more troubles sleeping since." *Id*. About this time, petitioner reported tingling in his left thumb and radial wrist and a "burning sensation" in his left thumb that lasts a few seconds. Upon examination, his left-hand strength was normal, but his left shoulder was weaker. *Id*. He did not recall any previous reactions to vaccination

---

[11] Cervical radiculopathy is radiculopathy of cervical nerve roots, often with neck or shoulder pain; compression of nerve roots is a common cause in this area. *Cervical radiculopathy, Dorland's Medical Dictionary Online*, *https://www.dorlandsonline.com/dorland/definition?id=101392&searchterm=cervical+radiculopathy* (last visited Feb. 27, 2023).

[12] The medical records show that petitioner received the flu vaccine on October 20, 2015. Pet. Ex. 1 at 2.

but remembered left shoulder pain for a few weeks in 2005. The assessment was shoulder injury related to vaccine administration ("SIRVA") that was expected to gradually improve over the next few weeks to months. *Id*. at 94. It was also noted that he "possibly could have concomitant cervical radiculopathy". *Id*.

On January 2, 2016, petitioner presented to the ER with a history of cervical radiculopathy and exacerbation of neck pain still radiating to his left hand. Pet. Ex. 3 at 88-89, 109. His chief complaint on that date was neck and upper back pain ongoing for 3 days that had worsened. His pain was not alleviated with baclofen, so he wanted a stronger medication. Petitioner had no other complaints. *Id*. Upon examination, petitioner had neck tenderness at C5-C6 and tender left trapezius with no restriction of movement. The ER physician injected petitioner with Decadron and Toradol and prescribed Tramadol oral 50mg, Meloxicam 15mg, prednisone 20mg, and Thera-Gesic cream. *Id*. at 10, 11, 110.

Petitioner presented to a neurologist for nerve conduction velocity ("NCV") and electromyography ("EMG") studies on February 11, 2016 for left cervical radiculopathy vs. neuropathy. Pet. Ex. 3 at 207-09. The neurology record documented left shoulder pain starting about 2 days after receiving a flu shot in his left deltoid muscle during the last week of October or first week of November 2015. *Id*. at 63-64. Since then, his left shoulder has continued to improve, but about one month after receiving the shot, he began to experience numbness and tingling throughout his left upper extremity. *Id*. He no longer had tingling in the left hand but was still aware of mild non-tingling and numbness on the palmer aspects of his left thumb and index finger. *Id*. at 64, 123. The results of the NCV and EMG studies were abnormal with evidence of a "mild-moderate active left C6 radiculopathy." *Id*.

Petitioner's next medical visit was on June 1, 2016, when he presented to the VA for "Multi-problem f/u". Pet. Ex. 3 at 160. He was treated for active cervical radiculopathy. *Id*. at 4. He was noted to have bilateral arm numbness somewhat improved since his December visit. His left shoulder pain was "all resolved", with good range of motion. However, his left arm was weaker, and he reported that it was "hard to pick up ½ gal of milk or juice. Nearly dropped objects w/L hand. Is R handed. No arm pain". *Id*. at 160. His physician believed his SIRVA had likely resolved. *Id*. at 162. His left plantar fasciitis was doing well with inserts. *Id*. at 160-161. His left knee was "off and on" painful but stable with flares from walking up stairs or a ladder. He did not recall a prior left knee injury. *Id*. His motor strength of small muscle of the hands and large muscles of the arms was 5/5 bilaterally. *Id*. at 161. However, his left pincer grip was 3/5. *Id*. The EMG taken in February 2016 showed evidence of mild-moderate active left C6 radiculopathy. *Id*. The notes indicate that he had degenerative disc disease of the lower cervical vertebrae. *Id*. at 162.

On July 19, 2016, petitioner underwent an MRI of the cervical spine due to active C6 left radiculopathy shown on his EMG and neck pain that radiated to his left hand. Pet. Ex. 3 at 28-30. The findings included mild multilevel degenerative disc disease without spinal canal stenosis. At C5-C6 there was mild right greater than left neuroforaminal stenosis. *Id*.

The remainder of petitioner's treatment after June 1, 2016 was for ongoing neck pain with numbness in both arms and pain in his lower back. Pet. Ex. 3 at 82-83; 57; 184; 203; 205-06.

Petitioner received a pneumococcal vaccine on March 10, 2017, an influenza vaccine on October 23, 2017, and Hepatitis A/B vaccines on August 15, 2017 and February 16, 2018. Pet. Ex. 4 at 7. It was not documented in which arm he received each vaccine.

### B. Petitioner's Affidavits and Testimony

Petitioner affirmed that he was "in excellent health" prior to his vaccination, although he has had shoulder/arm injuries in the past. Tr. 9; Pet. Ex. 2 at 1. The most notable left shoulder pain he could remember was when he was lifting weights in the Navy in 1979; the pain resolved on its own when he stopped lifting weights. Tr. 9, 29, 77, 78; Pet. Ex. 6 at 4; *see also* Pet. Ex. 3 at 111. Petitioner described this pain as muscle soreness and minor joint pains rather than significant shoulder pain. Pet. Ex. 6 at 3. He recalled a left shoulder injury around 2005 from pulling something or sleeping on his shoulder wrong; the pain lasted about three weeks and resolved on its own. Tr. 26-27, 38, 78; *see also* Pet. Ex. 3 at 100. He also had tennis elbow in his right elbow in 2009 from using the grab handle in his car to pull himself out of the vehicle. Tr. 9-10, 25-26, 76; Pet. Ex. 6 at 3; *see also* Pet. Ex. 3 at 100. Once he stopped using the grab handle, his tennis elbow resolved. Tr. 10, 26.

Petitioner received the flu vaccine in his left shoulder at a Walgreen's on October 20, 2015. Tr. 12, 13; Pet. Ex. 2 at 1; Pet. Ex. 6 at 1. The person who administered the vaccine was standing and he was seated; the shot was "real high up on the shoulder. And when she put the needle in, it was real hard." Tr. 13; Pet. Ex. 6 at 1. He recalled a "pinch" and pressure. Tr. 13; Pet. Ex. 6 at 1-2. However, because he is not a doctor, he shrugged off the pain. Tr. 14; Pet. Ex. 6 at 2. The person administering the vaccine told him to be active with his shoulder to avoid soreness and informed him that his shoulder may be sore for a few days. Tr. 14; Pet. Ex. 6 at 2. He told her that he planned to do yard work that afternoon. Tr. 14.

Petitioner recalled doing "[p]retty heavy yard work" that afternoon after receiving the vaccine. Tr. 15. He was on his hands and knees pulling Wisteria from underneath the deck that had been growing for several years. Tr. 15. He did not recall having any pain the evening of the vaccine. Tr. 15; Pet. Ex. 6 at 2.

The following day after the vaccine, petitioner recalled having pain in his upper body—shoulders, neck, chest, and back. Tr. 16, 23-24, 61; Pet. Ex. 6 at 2. He attributed the pain to the yardwork he did the day before. Tr. 16, 67. However, over the next day or so, most of his pain decreased, but the left shoulder pain was getting more severe. Tr. 16, 23-24, 61, 65; Pet. Ex. 2 at 1; Pet. Ex. 6 at 2. He described the pain as a "persistent ache in the area surrounding the injection site" that progressed to extreme pain. Pet. Ex. 2 at 1; Pet. Ex. 6 at 2. Petitioner clarified at hearing that he had pain [in his left arm] the day after the vaccine, but the excruciating pain began three days later. Tr. 61; Pet. Ex. 6 at 2.

He knew something was wrong when the shoulder pain began getting worse and worse. Tr. 24. He noticed pain if he put his arm behind him or raised it. Tr. 17, 40. He described the pain as "persistent and constant". Tr. 18. He affirmed that he did not have any numbness when his shoulder symptoms first manifested; the numbness started later and was only in his arms and hands. Pet. Ex. 6 at 4; Tr. 70. He did not visit a doctor because he thought the pain would go away on its own. Tr. 17, 24; Pet. Ex. 2 at 1; Pet. Ex. 6 at 2.

6

Then, the pain started to affect his sleep and he was mostly unable to use his left arm. Tr. 19, 79; Pet. Ex. 2 at 1, 2; Pet. Ex. 6 at 3. He recalled telling his son, his mom and sister, and his neighbors about the pain but could not recall exactly when that was. Tr. 19, 83; *see also* Pet. Ex. 6 at 2, petitioner affirmed that he "did not discuss this pain with other people at the time of onset."

Petitioner stated that he used a heating pad to treat the pain, but it did not help. Tr. 18, 21. He also tried a cold pack, aspirin, and Tylenol. Tr. 21; Pet. Ex. 6 at 3. After around three weeks to a month with no improvement, petitioner contacted the VA nurse's hotline on November 19, 2015, and reported his left shoulder pain and numbness. Pet. Ex. 6 at 4. He described the numbness as tingling going down his arm and into his hand. Tr. 70. He was advised to go to the emergency room. Tr. 21; Pet. Ex. 6 at 4; Pet. Ex. 3 at 106. This was his first report of his persistent shoulder pain to any provider. Tr. 60, 70.

On November 20, 2015, petitioner spoke by telephone to his PCP. A nurse documented the call as petitioner stating that "everything was fine until 3 days after the shot." Pet. Ex. 3 at 100. Petitioner disagreed with this note and explained that he had shoulder pain the day after the vaccine, and everything was not fine. Tr. 62. He affirmed that he probably agreed with the nurse that his pain began "a few days" after the vaccine, which was interpreted as three days. Pet. Ex. 6 at 2. The call notes also indicate that petitioner "looked [his symptoms] up on the internet", which he agreed was possible. Pet. Ex. 3 at 100; Tr. 63-64. He also agreed that he reported numbness and tingling that came and went during the call. Tr. 71.

The same day, petitioner went to Walgreens and reported his left shoulder pain. Pet. Ex. 3 at 100. He was told that the information related to his receipt of the vaccine would be entered into a federal database. Tr. 24.

He presented to the ER on November 21, 2015 with shoulder pain and "some numbness" in his arm and into his hand present for one month. Tr. 22, 71-72; Pet. Ex. 2 at 2; *see also* Pet. Ex. 3 at 111. He felt like his arm was going to sleep, and the feeling did not go away. Tr. 22. He agreed that the record documents pain associated with cervical neck and left scapular pain, but believed the note was written out of context; he recalled a little bit of pain two or three days after the vaccine but three days after, the pain was "getting out of control." Tr. 23, 28. Petitioner was not sure why the notes document scapular pain when he told the nurse he had shoulder pain. He did not recall his scapula hurting at that time. Tr. 28. He did not recall mentioning his neck. Tr. 28.

According to petitioner, around the same time that his shoulder was getting sore, he was experiencing some numbness going down his arm and into his hand that had been present for about a month. Tr. 30-31. He recalled having x-rays of his left shoulder that did not reveal any problems. Tr. 31, 32; Pet. Ex. 6 at 4. He affirmed that the doctors "found some concern with arthritis in the vertebrae in [his] neck at C5-C6." Pet. Ex. 6 at 4.

Petitioner called his PCP's office on November 30, 2015 and told the nurse that he had not had any improvement since his November 21 ER visit. He stated he used his left arm to guide the direction of a ladder the day before and his arm ached all day after that. Pet. Ex. 3 at 99; Tr. 58. He acknowledged that the record documents the "same constant numbness and tingling in [his]

7

left arm" but clarified at hearing that the numbness started after the vaccine, although he couldn't remember exactly when it began. Pet. Ex. 3 at 99; Tr. 72-73.

Petitioner stated that when he presented for follow up with his PCP on December 14, 2015, his shoulder was better but had not "completely resolved". Tr. 35-37; 39; *see also* Pet. Ex. 3 at 93. Petitioner confirmed that he received the flu vaccine on October 20, 2015, not November 20, 2015 as the record documents and assumed that the record documenting his pain as better three weeks later was based on the incorrect date of the vaccine as November 20, 2015. Tr. 36-37. He stated that the pain was definitely not better three weeks after October 20, 2015 but was better three weeks after late November. Tr. 36-37. He disagreed that he was sleeping fine stating that he slept poorly due to shoulder pain from the time of the vaccine until at least January 2016. Tr. 79-81. Petitioner also reported tingling in his arm and hand at this visit. Tr. 73-74; Pet. Ex. 3 at 93.

Petitioner recalled visiting his mother and sister in Pennsylvania in late December 2015. Tr. 42; Pet. Ex. 2 at 2. On December 29, 2015, his mother asked him to hang mirrors, which required him to move a dresser. Tr. 42, 43, 46. Although he favored his right shoulder while moving the furniture, the following day he experienced severe left shoulder pain that was similar to the pain he experienced following the vaccine. Tr. 42, 44; Pet. Ex. 2 at 2. The pain persisted for several weeks, and medication did not provide any relief. Tr. 42; Pet. Ex. 2 at 2; Pet. Ex. 6 at 5.

He discussed his ER visit on January 2, 2016[13] for shoulder pain. Tr. 45, 74; *see also* Pet. Ex. 3 at 118. He did not recall complaining of symptoms related to his neck or upper back. Tr. 45. He had an x-ray and MRI. Pet. Ex. 2 at 2. Petitioner disagreed that he presented for exacerbation of neck pain radiating to his left hand. Pet. Ex. 3 at 109. He stated that the physicians kept focusing on his neck even though he repeatedly informed them he was there for his shoulder. Tr. 46, 74-75, 86-87. He agreed however, that he had pain radiating down his arm into his hand and that medication was not helping. Tr. 47, 75.

Petitioner stated that his pain was improving by February 2016. Tr. 48. On February 11, 2016, petitioner had a NCS and EMG performed. Tr. 32-33; Pet. Ex. 3 at 64, 123. The notes stated that he was no longer experiencing tingling in his left hand. Pet. Ex. 3 at 64. Petitioner disagreed, stating that the tingling was still present. Tr. 50.

Petitioner affirmed that he had most of his functional use of his left shoulder by April 2016. Tr. 48, 53. However, although the pain was mostly gone, he still had trouble grabbing things, getting stuff out of the refrigerator, and putting dishes away. Tr. 48. He affirmed that in April of 2016, his shoulder was still not back to its pre-vaccine level. Tr. 53. There are no medical records for March, April or May of 2016.

Petitioner stated that on June 1, 2016 he presented to his PCP for bilateral arm weakness. Tr. 40; Pet. Ex. 3 at 160-61. He had some numbness in his right arm, but it was worse in his left arm and left hand. Tr. 40, 54. Petitioner stated that his left shoulder pain had pretty much resolved by June 2016, but his arm was still weak. Tr. 55. He stated that the weakness resolved after the

---

[13] Although petitioner wrote in his affidavit that he presented to the ER on January 1, 2016, the medical records show that this visit was actually on January 2, 2016. Pet. Ex. 2 at 2; Pet. Ex. 3 at 118.

summer of 2016. Pet. Ex. 6 at 5. He also affirmed that he has not had neck problems since 2016. Tr. 55. He has only had minor, self-resolving aches and pains since. Tr. 56.

Petitioner could not recall exactly when he learned of SIRVA or the Vaccine Program, but believed it was when he first googled his symptoms several months after he received the vaccine. Tr. 41, 56-57, 68-69; *see* Pet. Ex. 3 at 100.

Petitioner used a calendar to note appointments during that timeframe. Tr. 20. When he reviewed the calendar, there was an entry on the date of the vaccine that said, "shot from hell". Tr. 20-21. Petitioner did not recall exactly when he made that notation on the calendar but stated that it was after he received the vaccine. Tr. 88.

Petitioner clarified that the tingling and numbness he experienced were in his arm and hand—not his shoulder—and started about a month after the left shoulder pain began from the vaccine. Tr. 85-86; Pet. Ex. 6 at 4. The only symptom he experienced in his left shoulder was pain. Tr. 85-86. Despite his pain, petitioner confirmed that he has since had a flu shot. Tr. 84.

### C. Other Evidence

#### a. Internet Search History

After the hearing, petitioner filed the results of his internet search history. Pet. Ex. 8. There were no results showing that he searched "shoulder pain vaccination" between October 1, 2015 to November 30, 2015. *Id.* at 1. There was one search result on December 14, 2015, where petitioner visited "Went For A Flu Shot, Got A Shoulder Injury Instead – A Mommy Story". *Id.* at 2.

No other searches were filed.

#### b. Calendar

Petitioner also filed his calendar pages from October 2015 to June 2016. Pet. Ex. 7. Consistent with his testimony, there was a notation on October 20, 2015, the day of the vaccine that said, "shot from hell". *Id.* at 1. The only notes for the month of November 2015 were "vita D" every Friday. *Id.* at 2. The pages from December 2015 and January 2016 were similarly unrevealing. *Id.* at 3-4. There was a note on February 11, 2016 for an appointment at the Durham VA. *Id.* at 5. The calendar pages for March 2016 through June 2016 did not contain any relevant notations. *Id.* at 6-9.

## III. Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing his claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

9

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in an accurate manner, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.,* No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), vacated on other grounds, *Sanchez by & through Sanchez v. Sec'y of Health & Human Servs.*, No. 2019-1753, 2020 WL 1685554 (Fed. Cir. Apr. 7, 2020), review denied, *Sanchez by & through Sanchez v. Sec'y of Health & Hum. Servs.*, 152 Fed. Cl. 782 (2021); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F. 2d. 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"). In making contemporaneous reports, "accuracy has an extra premium" given that the "proper treatment hang[s] in the balance." *Id.* A patient's motivation for providing an accurate recount of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993); *see Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). Contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Cucuras*, 993 F.2d at 1528. Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Id.*

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be given. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy given to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez*, No. 11-685V, 2013 WL 1880825, at *3 (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"). In short, "the record as a whole" must be considered. § 13(a).

## IV. Discussion and Findings of Fact

Petitioner alleges that he suffered "injuries resulting from adverse effects" of the flu vaccine he received on October 20, 2015. Amended Petition at 1. Given the testimony at hearing and the medical records filed, it is presumed that the injury petitioner alleges he suffered is a SIRVA. *See* Amended Petition at 2; Pet. Ex. 3 at 93-94.

A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
> (ii) Pain occurs within the specified time frame [within 48 hours of vaccine administration];
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Petitioner requested a detailed Findings of Fact regarding petitioner's alleged SIRVA. ECF No. 42. Though petitioner filed a status report after the hearing requesting that all fact issues be resolved, respondent did not file any response to that status report. As such, respondent's positions on issues other than onset are unknown and/or not fully developed. Therefore, only the issue of onset is determined herein.

11

### A. Onset of Symptoms

In reviewing the records and testimony as a whole, I find that there is preponderant evidence to support the onset of petitioner's left shoulder pain the day after his October 20, 2015 flu vaccination, or on October 21, 2015.

Petitioner received the subject flu vaccine in his left shoulder on October 20, 2015. Tr. 12, 13; Pet. Ex. 2 at 1; Pet. Ex. 6 at 1. Petitioner recalled specific details about his vaccination that struck him as odd, including the administrator of the vaccine standing while he was seated, with the shot given "real high up on the shoulder." He recalled there was a "pinch" and pressure. Tr. 13; Pet. Ex. 6 at 1-2. However, because he is not a doctor, he dismissed the pain. Tr. 14; Pet. Ex. 6 at 2. At some point after vaccination, petitioner made a note on his calendar for October 20, 2015 that said "shot from hell". Pet. Ex. 7 at 1; Tr. 88.

Later that day, petitioner engaged in "[p]retty heavy yard work." Tr. 15. He did not remember any pain the evening of the vaccine. Tr. 15; Pet. Ex. 6 at 2.

The following day, petitioner experienced pain in his shoulders, neck, chest, and back. Tr. 16, 23-24, 61; Pet. Ex. 6 at 2. He initially attributed his pain to the yard work he did the day before and to typical soreness following a vaccine, which the administrator of the vaccine told him to expect. Tr. 16, 67; Pet. Ex. 6 at 2. In the next day or two, most of the pain throughout his upper body decreased but his left shoulder pain was getting more severe. Tr. 16, 23-24, 61, 65; Pet. Ex. 2 at 1; Pet. Ex. 6 at 2. Thinking the shoulder pain would resolve on its own, petitioner did not visit a doctor for nearly one month. Tr. 17, 24, 60, 70; Pet. Ex. 2 at 1; Pet. Ex. 6 at 2, 4.

On November 20, 2015, he called his PCP. The record documents that he reported that "everything was fine until 3 days after the shot." Pet. Ex. 3 at 100. Petitioner agreed he probably reported the pain began "a few days" after the vaccine, which was interpreted as three days. Pet. Ex. 6 at 2. At hearing, petitioner disputed this note, maintaining that he had pain in his shoulder the day after the vaccine and "everything was not fine". Tr. 62. He had pain the day after the flu vaccine, but the excruciating pain began three days later. Tr. 61; Pet. Ex. 6 at 2.

Witness testimony may, in some circumstances, overcome the presumption of accuracy given to contemporaneous medical records. *See Sanchez*, No. 11-685V, 2013 WL 1880825, at *3. The Vaccine Act mandates that "the record as a whole" be considered. § 13(a). I found petitioner's testimony to be clear, candid, and compelling. He consistently maintained that he had shoulder pain the day after the vaccine. Tr. 16, 23-24, 61, 62, 67; Pet. Ex. 2 at 2; Pet. Ex. 3 at 100, 106, 111; Pet. Ex. 6 at 2. At first, he mistook his initial shoulder pain the day after the vaccine for soreness after doing heavy yard work and from typical soreness following vaccination. Tr. 16, 67. But as time went on and his shoulder pain persisted and grew worse, he knew something more serious was wrong. Tr. 24.  When questioned about records documenting that "everything was fine until 3 days after the shot", petitioner maintained that the onset of shoulder pain was the day after the flu vaccine, but the onset of excruciating pain began three days after the vaccine. Tr. 61; Pet. Ex. 6 at 2. Petitioner consistently placed onset of shoulder pain the day after the vaccination that progressed with onset of severe pain two or three days after he received the vaccine. Tr. 16, 61, 65; Pet. Ex. 2 at 1; Pet. Ex. 3 at 64; Pet. Ex. 6 at 2.

12

I find that there is preponderant evidence to support the onset of petitioner's left shoulder pain the day after his October 20, 2015 flu vaccine that progressed to severe left shoulder pain three days thereafter.

## V.     Conclusion

Reviewing the record as a whole, I find that there is preponderant evidence that the onset of petitioner's shoulder pain was the day after his receipt of the October 20, 2015 flu vaccine.

Accordingly, the following is ORDERED:

**By Thursday, April 6, 2023, the parties should file a joint status report advising whether they are willing to engage in settlement negotiations or whether petitioner will be required to file an expert report.**

**IT IS SO ORDERED.**

s/Mindy Michaels Roth
Mindy Michaels Roth
Special Master